Easterly, Associate Judge, concurring:
The panel agrees that B.E.L.S.' reunification with his mother is "not viable due to abuse, neglect, abandonment, or a similar basis" and thus that he is qualified to petition for Special Immigrant Juvenile Status. 8 U.S.C. § 1101 (a)(27)(J) (2009 Supp. II). My understanding of how the District's courts should adjudicate SIJS findings is best reflected in Benitez v. Doe , 193 A.3d 134 (D.C. 2018) ; E.P.L. v. J.L.-A. , 190 A.3d 1002 (D.C. 2018) ; and J.U. v. J.C.P.C. , 176 A.3d 136 (D.C. 2018). Specifically, I understand that our objective is not to determine if we should "deprive a parent of custody or ... terminate parental rights," but rather to "assess the impact of the history of the parent's past conduct on the viability, i.e., the workability or practicability of a forced reunification of parent with minor, if the minor were to be returned to the home country."
*779 176 A.3d at 141 ; see also E.P.L. v. J.L.-A. , 190 A.3d 1002, 1007 (D.C. 2018) (explaining "the question is not whether a juvenile without legal status has been neglected or abandoned by a parent in the abstract, but rather whether reunification of that juvenile with one or both of her parents is not viable due to [neglect or] abandonment") (internal quotations and citations omitted).
Ferren, Senior Judge, concurring in the judgment:
In three earlier proceedings, we reversed trial court decisions declining to grant SIJS on grounds of "abandonment."[1] Although I respect my colleagues' analysis, I cannot agree that these earlier decisions support reversal here. Contrary to the facts in those cases, the record before us confirms not abandonment but a continuing "parental relationship"[2] between B.E.L.S. and his mother extending from Guatemala to Washington, D.C. Nonetheless, I concur in the judgment because I believe that other statutory language compels us to rule that B.E.L.S.'s mother "neglected" her son by sending him away from home alone with human smugglers, and that under these circumstances a forced reunification of mother and son in Guatemala would not be "viable."[3]
I.
Under District of Columbia law, a "neglected child" includes a child [1] "who has been abandoned or abused by his or her parent, ... or [2] whose parent has failed to make reasonable efforts to prevent the infliction of abuse upon the child."[4] As to the first clause, there is no allegation of "abuse" here, and, given the statutory language applicable to "abandonment," I cannot conclude that B.E.L.S.'s mother has abandoned him.
A court may infer abandonment if a parent "has made no reasonable effort to maintain a parental relationship with the child for a period of at least four (4) months."[5] In this case, B.E.L.S's mother retained a "right of visitation" in her custody agreement with the boy's father and has regular Saturday phone calls with her son here in the District. Her physical relationship with B.E.L.S. has been suspended, but her head and her heart-and thus her advice and her comfort-are still with him.[6] For me, therefore, it is too great a stretch to say that she has made no reasonable "effort to maintain a parental relationship" with B.E.L.S.[7]
*780 II.
Absent abandonment, however, there is still a serious question under the second clause of the District's neglect statute.[8] Did B.E.L.S.'s mother, by sending her minor son on a journey with human smugglers (creating a "substantial risk to his life"),[9] "fail[ ] to make reasonable efforts to prevent the infliction of abuse upon the child"?[10] The trial court did not consider that question.[11] In my view, however, a decision to entrust one's child to human smugglers (pejoratively called "coyotes")[12] presumptively creates an unreasonable risk of child abuse; it is no less neglectful than failure to provide a child with "adequate food, clothing, shelter" or other basic needs.[13]
Although the trial court entirely rejected B.E.L.S.'s testimony that he had been sent away because a gang had threatened him with harm if he would not sell drugs, I agree with my colleagues that the omission of such a finding does not conclusively negate the possibility that B.E.L.S.'s mother may well have worried about the approach of a gang, and thus had to deal with conflicting fears of a gang threat and a smuggler's journey.[14] But even if the trial court had found that, yes, gang members twice approached B.E.L.S. to sell drugs, there would be no record basis for determining whether, on balance, the decision to send B.E.L.S. with smugglers, rather than risk keeping him at home (unprotected by allegedly indifferent or corrupt police), was neglectful. B.E.L.S.'s mother did not respond to appellee's petition, let alone testify at the hearing, and thus a remand for further findings as to her motivation, straightforward or mixed, could result only in speculation.
We cannot leave the matter in equipoise, however. In the first place, as the opinion for the court explains based on the intent of Congress, "all the relevant factors must be understood in the light most favorable to determinations of neglect and abandonment."
*781 [15] Congress, of course, has delegated an important measure of discretion to state courts, applying SIJS as a first step toward an immigration decision. But in an ambiguous situation as we have here in assessing "neglect," the trial court-consistent with the intent of Congress-should ordinarily make a decision favorable to the SIJS petitioner. Such close cases should become ultimately a federal, not a state, responsibility once a state court has entered a custody order under state law. Otherwise, when state courts apply their local law in this unique, international context, they may well impose narrow formulations of neglect and abandonment at odds with the ultimate judgments that federal immigration authorities would make if an SIJS petition had been approved for their consideration.[16]
For me, then, the focus is on the obvious danger to B.E.L.S. from a journey with human smugglers (a reasonable stretch of judicial notice that other courts have similarly taken).[17] I am persuaded that whatever the parental motivation-fear of a gang or a mere desire to launch a child toward a better life-the enlistment of human smugglers is presumptively an act of neglect under District of Columbia law. Conceivably a trial court could find that a foreign parent who hired a particular smuggler under specific circumstances had made a "reasonable effort[ ] to prevent the infliction of abuse upon the child."[18] But in the absence of such a showing, I will not speculate that the decision of B.E.L.S.'s mother to send him away with smugglers was reasonable enough for this court to conclude that her action was not neglectful.
III.
Finally, having ascertained the mother's neglect, I join my colleagues in concluding that forced reunification of B.E.L.S. with his mother in Guatemala would not be viable.[19] Of course, viability of reunification is not determined simply by reference to a child's treatment as of the time he or she left the family home.[20] Viability, rather, turns on a foreseeability inquiry as to whether, at the time of SIJS adjudication, the child would be subject to abuse, neglect, abandonment, or similar treatment if reunified with a parent in the foreign country-an inquiry that focuses on "the workability or practicability of a forced reunification."[21]
My colleagues conclude that a forced reunification of B.E.L.S. with his mother would not be viable because, "given [her] perception of continuing gang danger to B.E.L.S.[,] ... his mother might well attempt a second, similar abandonment."[22] Whatever his mother's motive was, it was strong enough to cause her to hire human *782 smugglers in the first instance. There is no reason to believe that B.E.L.S.'s mother's level of "neglect" reflects a less obvious risk of a second journey endangering B.E.L.S. in the hands of human smugglers than the same facts characterized as "abandonment." I therefore agree with my colleagues that forced reunification of B.E.L.S. with his mother in Guatemala would be "not viable."[23]
* * * * *
I realize that this analysis shakes down to a conclusion that enlistment of human smugglers to carry an unaccompanied child up to or across an international border amounts to neglect per se when the sending parent-who typically has no desire to oppose an SIJS petition-fails to do so. I therefore acknowledge that no practical limiting principle exists under local law in such a case. Nonetheless, allowing SIJS proceedings to go forward without the participation of a foreign parent, properly notified of that proceeding, is fully consistent with District law.[24] Whether this leads to a loophole in the SIJS structure is not the concern of state courts (including ours), but rather a question for federal immigration authorities deciding SIJS petitions under federal law.[25]
For the foregoing reasons, I join the judgment of the court.

See Benitez v. Doe , 193 A.3d 134, 138 (D.C. 2018) ("The record reveals, [ ] that John Doe has made no effort to assume any parental responsibility for J.V.B., never participated, directly or indirectly, in her care and upbringing, and has never made himself known." (internal brackets and quotation marks omitted) ); E.P.L. v. J.L.-A. , 190 A.3d 1002, 1007 (D.C. 2018) ("[T]he undisputed evidence established that M.L.P.'s father had left M.L.P. behind in Guatemala when she was six months old ... and even during the pendency of the proceedings had not exercised his right to visitation to meet M.L.P. to attempt to establish a relationship with her."); J.U. v. J.C.P.C. , 176 A.3d 136, 142-43 (D.C. 2018) ("[T]he father, while perhaps not without affection for his son ... never provided a home with father and son together, never exercised the day-to-day oversight with parental decisions incumbent upon proper care and supervision, ... and essentially outsourced all these duties to others.").

D.C. Code § 16-2316 (d)(1)(C) (2012 Repl.).

8 U.S.C. § 1101 (a)(27)(J)(i) (2009 Supp. II), quoted ante at 773 note 1.

D.C. Code § 16-2301 (9)(A)(i) (2012 Repl.).

D.C. Code § 16-2316 (d)(1)(C).

Cf. supra note 1.

D.C. Code § 16-2316 (d)(1)(C).

See supra text accompanying note 4.

Ante at 777.

D.C. Code § 16-2301 (9)(A)(i).

The trial court limited its analysis to whether B.E.L.S. had been subject to parental abuse or neglect "prior to his departure from Guatemala," more specifically, "before his mother sent him to live with his father in the United States." The court thus appears to believe that parental "neglect" under the SIJS statute is limited to whether a child had been abused or deprived of basic needs (food, clothing, shelter, etc.) at home in the foreign country and, if so, would be similarly treated upon a forced reunification. As a result, by limiting "neglect" to interactions within the child's immediate family-indeed, by focusing exclusively on the illness and unemployment of B.E.L.S.'s mother, and the financial support supplied by the boy's father-the trial court excluded any possibility that "neglect" also may have included the decision to entrust B.E.L.S.'s fate to the care of human smugglers for the long and dangerous journey to the United States (whether motivated by a gang threat or otherwise). The trial court acknowledged that, in coming to the United States, B.E.L.S. would "be distant from public safety concerns in Guatemala." But that observation was limited to the court's conclusion under subsection (ii) of the SIJS statute, see ante at 773 note 1, that B.E.L.S.'s "best interest" would be served by remaining in the United States, see ante at 774, which of course the trial court's ultimate ruling precluded.

See United States v. Calderon-Lopez , 268 Fed. App'x 279, 282 n.3 (5th Cir. 2008) ("In the smuggling context, smugglers are generally known as 'coyotes.' "); see also United States v. Melchor , 360 Fed. App'x 8, 10 (11th Cir. 2010) (referring to " 'coyotes' or human traffickers").

D.C. Code § 4-1341.01 (3) (2012 Repl.) (adding "education" and "medical care" to the list of basic needs).

See ante at 778.

Ante at 777.

See ante at 776.

See ante at 777 note 30.

D.C. Code § 16-2301 (9)(A)(i).

Ante at 778.

See J.U., 176 A.3d at 140 ("It is not the abstract question whether the minor has been neglected or abandoned by the [parent in the foreign country]. Rather it is whether reunification with the [parent in the foreign country] is [not] 'viable' due to" foreseeable abuse, neglect, or abandonment.); see id. at 143 ("Given the flexibility of the [viability] concept depending on the context for which the determination is being made," the court looks to "the lifelong history [of the parent-child relationship] and the bearing of that history on the prospects [of reunification] if [the minor] were to be returned to the immediate custody of the [parent] in the home country.").

Id. at 141.

Ante at 778.

8 U.S.C. § 1101(a)(27)(J)(i), quoted ante at 773 note 1.

See D.C. Code §§ 16-2359 (a) (2012 Repl.) ("If the parent has been given proper notice [of a proceeding to terminate parental rights] but has failed to appear the judge may proceed in his or her absence."), -2388 (a) (2012 Repl.) ("If a parent has been given proper notice [of a permanent guardianship proceeding] but fails to appear, the court may proceed in the parent's absence."); ante at 775 (quoting USCIS Policy Manual ).

See 8 U.S.C. § 1101 (a)(27)(J)(iii), quoted ante at 773 note 1.